Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL V

| | | |
|---|---|---|
| NILSA ENID PUJOLS CHICO **Apelada** V. JESÚS BERRIOS ORTIZ **Apelante** | KLAN202400100 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Aibonito<br><br>Civil. Núm. B AL2013-0261<br><br>Sobre: Alimentos Excónyuge |

Panel integrado por su presidente, el Juez Hernández Sánchez, la Jueza Romero García y la Jueza Martínez Cordero.

**Hernández Sánchez, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 4 de abril de 2024.

El 5 de febrero de 2024, el Sr. Jesús Berrios Ortiz (señor Berrios o apelante) compareció ante nos mediante una *Apelación* y solicitó la revisión de una Sentencia que se dictó el 14 de septiembre de 2023 y se notificó el 20 de septiembre de 2023 por el Tribunal de Primera Instancia, Sala Superior de Aibonito (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar la solicitud de pensión excónyuge que presentó la Sra. Nilsa Enid Pujols Chico (señora Pujols o apelada). En consecuencia, le impuso al señor Berrios una pensión alimentaria excónyuge de quinientos cincuenta ($550.00) dólares mensuales retroactivo a la fecha de radicación de la referida solicitud a saber, el 22 de julio de 2013. En vista de ello, puntualizó que el apelante adeudaba un retroactivo de ciento veintidós (122) meses para un total de $67,100.00. Aclaró que, de la suma antes expuesta, la apelada tenía un crédito en el caso de División de Bienes Gananciales. Por último, le ordenó al señor Berrios a pagar cinco mil ($5,000.00) dólares por concepto de honorarios de abogado.

Por los fundamentos que expondremos a continuación, *modificamos* el dictamen recurrido y así modificado *confirmamos*.

Número Identificador

SEN2024 _____

I.

El 7 de diciembre de 1981 el señor Berrios y la señora Pujols contrajeron matrimonio.[1] Posteriormente, el 3 de junio de 2013, el TPI dictó *Sentencia* en el Caso Civil Núm. B3RF201200017 mediante el cual se decretó la disolución del vínculo matrimonial existente entre las partes.[2] Asimismo, mediante este dictamen, el TPI le ordenó al señor Berrios a pagar la cantidad de doscientos cincuenta ($250.00) dólares durante diez (10) meses por concepto de pensión *pendiente lite.* Además, dispuso que la apelada continuaría recibiendo el pago de trecientos ($300) dólares correspondientes a la renta de uno de los inmuebles pertenecientes a la sociedad de gananciales hasta su liquidación.

Así las cosas, el 10 de julio de 2013, la apelada presentó una *Demanda* sobre alimentos excónyuge en contra del señor Berrios. En síntesis, solicitó sostén económico para poder sufragar sus necesidades básicas. Adujo que el señor Berrios tenía capacidad económica para sufragarlos ya que presuntamente tenía control de todos los bienes adquiridos durante el matrimonio. Así pues, solicitó dos mil quinientos ($2,500.00) dólares por concepto de alimentos y la suma de cinco mil ($5,000.00) dólares por concepto de honorarios de abogado. El 11 de octubre de 2013, el apelante presentó su alegación responsiva.

Luego de varios trámites procesales, el 11 de enero de 2018, el TPI emitió una *Resolución y Orden* mediante la cual determinó que procedía una pensión provisional a favor de la señora Pujols. En consecuencia, le ordenó al apelante a pagarle a la apelada la cantidad de cuatrocientos ($400.00) dólares mensuales hasta la culminación final del caso o hasta la liquidación de la comunidad de bienes gananciales. El señor Berrios solicitó la revocación de este dictamen mediante un recurso de *certiorari* ante el Tribunal de Apelaciones en el

---

[1] Algunos de los hechos procesales de esta *Sentencia* se adoptaron de la *Sentencia* que emitió nuestro panel hermano el 16 de agosto de 2021 en el Caso Núm. KLCE202100706 para poder realizar un tracto procesal más completo.
[2] Véase, págs. 84-85 del apéndice del recurso.

Caso Núm. KLCE201800503. Nuestro panel hermano emitió una *Resolución* denegando el recurso.

Así las cosas, el 19 de marzo de 2021, el apelante presentó una *Moción Solicitando Relevo de Pensión Provisional*. En esta expresó que la señora Pujols recibió la suma de setenta y cinco mil ($75,000.00) dólares por concepto de la venta de un inmueble de la extinta sociedad legal de gananciales. Argumentó que ello colocaba a la apelada en una posición de poder velarse por sí misma sin la necesidad de que éste le proveyera una pensión alimentaria. El 12 de abril de 2021, el TPI declaró No Ha Lugar la solicitud del apelante. Inconforme con este dictamen, este último solicitó reconsideración y esta solicitud fue declarada No Ha Lugar.

Aún inconforme, el apelante compareció ante un panel hermano mediante un recurso de *certiorari* en el Caso Núm. KLCE202100706 impugnando la determinación del TPI de no acoger su solicitud del relevo de pensión provisional.[3] El 16 de agosto de 2021, este panel dictó una *Sentencia* mediante la cual revocó la *Resolución y Orden* que dictó el TPI el 12 de abril de 2021 y le ordenó a que celebrara una vista evidenciaria para que determinara el importe que le correspondía pagar al señor Berrios por concepto de pensión provisional conforme a las rentas de los bienes inmuebles controlados por éste.

En cumplimiento con este mandato, el TPI celebró unas vistas evidenciarias en las siguientes fechas: 18 de marzo, 6 de junio, 17 de junio, 26 de septiembre y 7 de noviembre de 2022. De este modo, el 14 de diciembre de 2022, el TPI dictó una *Resolución y Orden* que se notificó el 20 de diciembre de 2023 en la cual mantuvo la cantidad de cuatrocientos ($400.00) dólares previamente fijada por concepto de pensión provisional.[4] Posteriormente, el 14 de septiembre de 2023, el TPI dictó una *Relación del Caso, Determinaciones de Hechos, Fundamentos de Derecho y Sentencia* que se notificó el 20 de

---

[3] Íd., págs. 92-103.
[4] Íd., págs. 88-90.

septiembre de 2023.[5] En esta, tomando en consideración toda la prueba documental estipulada, así como la admitida en evidencia y otorgándole entera credibilidad a los testigos el TPI realizó las siguientes determinaciones de hechos:

1. Las partes contrajeron matrimonio el 7 de diciembre de 1981 en los Estados Unidos y se divorciaron el 3 de junio de 2013. Previo al matrimonio las partes convivieron varios años.

2. Durante el periodo de convivencia el cual duró aproximadamente de 4-5 años, y durante la vigencia del vínculo matrimonial la demandante trabajó en los Estados Unidos fuera del hogar en un trabajo parcial en McDonalds, luego (1) año en la fábrica de bolsas para aspiradora y en una pequeña fábrica de "control remoto"; una vez nació la hija procreada entre las partes, el demandado le impidió que esta fuera trabajar fuera del hogar.

3. Luego del nacimiento de la hija procreada por las partes, la demandante se dedicó al hogar y a su vez a administrar el negocio de jardinería que operaba el demandado, e hizo constar que no se depositaba todos los ingresos que generaba el negocio para así continuar recibiendo los beneficios gubernamentales mientras vivieron en los Estados Unidos.

4. Una vez el demandado fue declarado incapacitado por la Administración del Seguro Social se comenzó a depositar los ingresos del negocio de jardinería ("landscaping") a nombre de Carlos o Ángel, pero el dinero era de la sociedad legal de gananciales para así continuar recibiendo todos los beneficios gubernamentales. Los dineros que habían en las cuentas a nombre de Carlos o Ángel fueron retirados para la adquisición de bienes inmuebles en Puerto Rico, e incluso el balance restante fueron traídos a Puerto Rico una vez decidieron vivir en Puerto Rico.

5. Las partes allá para el año 1985 -1986 viajaron a Puerto Rico de vacaciones y adquirieron la vivienda conyugal la cual describe como pequeña y luego comenzaron a realizarle mejoras; y la razón por la cual la casa no está a nombre de éstos era debido a que recibían beneficios gubernamentales. La casa está a nombre de Carlos, el hermano del demandado. El dinero con que adquirieron dicho inmueble fue mediante un cheque de $25mil, y $10 mil en efectivo. Además, a principios de los años 90, las partes adquirieron otras propiedades.

6. Las propiedades que adquirieron son las siguientes:

a) Propiedad ubicada en Naranjito (1991)- el demandado aparece como soltero, a pesar de estar legalmente casado con la demandante, por lo que la misma

---

[5] Íd, págs. 1-29.

pertenece a la extinta sociedad legal de gananciales. La descripción registral de dicho inmueble es la siguiente:

**RÚSTICA:** Parcela de terreno en el Barrio Cedro Arriba de Naranjito, con una cabida superficial de dos puntos cincuenta cuerdas (2.50cds), equivalente a NUEVE MIL OCHO CIENTOS VEINTITRES PUNTO CERO CERO METROS CUADRADOS (9,823.00 m.c.): en lindes por el NORTE, con Juan A. Morales, por el SUR, con Rufino López; por el ESTE, con la carretera estatal número ciento cincuenta y dos (152) ruta de Naranjito a Barranquitas; y por el OESTE, con el Río Maravilla. Enclava una casa en concreto de una sola planta, que consiste en cuatro dormitorios, sala-comedor, cocina, baño, marquesina, y sótano. También contiene un local en concreto dedicado a negocio. Consta inscrita al folio doscientos cuarenta y cuatro (244), del tomo cincuenta y ocho (58) de Naranjito.

b) En el año 1994 adquirieron dos (2) propiedades en el término municipal de Corozal las cuales fueron puestas a nombre de otras personas como testaferros, luego de un litigio se determinó que las mismas pertenecen a la extinta sociedad legal de gananciales de las partes en la presente causa de acción. La descripción de dichos inmuebles es la siguiente:

**RÚSTICA:** Parcela de terreno radicada en el Barrio Palos Blancos marcada con el **Lote "D"** en el plano de inscripción, con una cabida superficial de OCHOCIENTOS DIECISIETE PUNTO CINCO MIL SETECIENTOS TREINTA Y SIETE METROS CUADRADOS, equivalentes a ocho áreas, diecisiete centiáreas y cincuenta y siete miliáreas; en lindes por el NORTE, con el lote "E", distancia de cuarenta y tres punto ochenta y cinco metros; por el SUR, con el lote "C", distancia de cuarenta metros; por el ESTE, con el remanente de la fina principal, distancia de diecinueve punto cincuenta y cinco metros y por el OESTE, con la carretera número ochocientos siete, distancia de seis punto treinta y cinco metros y catorce punto doce metros en dos alineaciones distintas. Enclava una casa de bloques de cemento, techada de concreto para una familia, consta de tres cuartos de dormitorios, sala-comedor, cocina, marquesina, balcón y servicio sanitario.

Consta inscrita al folio número doscientos ochenta y seis (286) del tomo ciento treinta (130) de Corozal, finca número siete mil ochenta y seis (7,086).

**RÚSTICA:** Solar marcado con el número setenta y seis (76) en el Plano de Parcelación de la Comunidad Rural Antonio Berio del Barrio Palmarito del término municipal de Corozal, Puerto Rico, con una cabida superficial de OCHOCIENTOS SETENTA Y CINCO DIEZ MILÉSIMAS DE CUERDA (875) equivalentes a TRESCIENTO CUARENTA Y TRES PUNTO SETENTA Y CINCO METRO CUADRADOS. En lindes por el NORTE, con la parcela setenta y siete (77); por el SUR, con la calle número cuatro (4); por el ESTE, con la parcela setenta y cinco (75).

Consta inscrita al folio ciento setenta y uno (171) vuelto del tomo ciento veintinueve (129) de Corozal, finca número seis mil novecientos sesenta (6,960).

c) **RUSTICA:** Predio de terreno radicado en el Barrio Barrancas del término municipal de Barranquitas, identificado en el plano de inscripción como la parcela 1, con una cabida superficial de 2,385.6138 metros cuadrados, equivalentes a 6070 cuerdas; en lindes por el NORTE, con la Carretera Estatal número 800; por el SUR, con el remanente de la finca principal; por el ESTE, con camino municipal y remanente y por el OESTE, con terrenos de Ángel Antonio Centeno y remanente de la finca principal. Enclava una estructura dedicada a vivienda de una sola planta.

Es segregación de la finca número 6342, inscrita al folio 245 del tomo107 de Barranquitas.

d) **RUSTICA:** Predio de terreno radicado en el Barrio Barrancas del término municipal de Barranquitas, Puerto Rico y marcado en el plano de inscripción con el número 1, con una cabida superficial de 1,600.00 metros cuadrados y en lindes por el NORTE, con acceso uso público: por el SUR, con remanente de la finca principal; por el ESTE, con acceso uso público y por el OESTE, con camino municipal. Enclava una estructura de dos plantas dedicada a vivienda.

Inscrita al folio 137 del tomo 218 de Barranquitas, finca 13,548.

e) **RUSTICA:** Predio de terreno radicado en el Barrio Cañabón del término municipal de Barranquitas, Puerto Rico, con una cabida superficial de 5.6466 cuerdas, equivalentes a 22,193.3401 metros cuadrados y en lindes por el NORTE, con terrenos de Juan Torres Aponte; al ESTE, con Primitivo Zayas, parcela segregada y vendida a Armando Valentín Sánchez y servidumbre de paso y por el SUR Y OESTE, con terrenos de Porfirio Arriaga. Enclava una estructura dedicada a vivienda de dos plantas.

Inscrita al folio 244 vuelto del tomo 143 de Barranquitas, finca 4354.

f) **RUSTICA**: Predio de terreno radicado en el Barrio Cañabón del término municipal de Barranquitas, con una cabida superficial de 1,389.2909 metros cuadrados y en lindes por el NORTE, SUR Y OESTE, en 20.337 metros, 20.028 metros, y en 58.496 metros, respectivamente, con el remanente de la finca principal y por el ESTE, en 22.707 metros con una servidumbre de paso de 6.00 metros de ancho que la separa de los terrenos del Sr. Primitivo Zayas y 37.579 con el remanente de la finca principal. Enclava una estructura dedicada a vivienda de dos plantas.

Inscrita al folio 238 vuelto del tomo 143 de Barranquitas, finca 8875.

7. Las partes se mudaron a Puerto Rico allá para el año 1996, y empezaron a hacerle mejoras sustanciales a la residencia conyugal, en adición, adquirieron otras propiedades.

8. El demandado recibe beneficios del seguro social por incapacidad desde el año 1985 aproximadamente, y a pesar de ello siempre ha trabajado. Dicho hecho quedó probado no solamente con el testimonio de la demandante, y por la hija procreada por las partes, sino que el propio demandado admitió dicho hecho e incluso el interventor, Carlos Berrios quien es hermano del demandado, también corroboró dicho hecho. Además, el interventor, Carlos Berrios admitió que la demandante durante el matrimonio, tanto en el tiempo que vivieron en Estados Unidos como en Puerto Rico era quien se encargaba de los negocios del demandado.

9. Durante la vigencia del matrimonio hasta el presente el demandado ha tenido control absoluto de todos los bienes perteneciente a la extinta sociedad legal de gananciales. Las partes tienen una comunidad de bienes que aún no ha sido dividida y se encuentra un caso activo de división de bienes gananciales en el Tribunal de Comerío bajo el número B3C/2013-0428.

10. El 10 de julio de 2013 instó reclamación de pensión alimentos excónyuge. En la sentencia de divorcio se estableció que esta continuaría recibiendo los $300 por concepto de la renta de uno de los inmuebles pertenecientes a la sociedad legal de gananciales28 hasta tanto y en cuanto se dividiera la comunidad habida entre éstos. Los hechos demostraron que la demandante recibió dicha suma de dinero hasta el mes de mayo de 2014 debido a que el demandado radicó una causa de acción de desahucio en contra del inquilino, padre de la demandante, quien residía en el inmueble desde el año 1997. Ello demuestra que la actuación del demandado era dejar desprovista a la demandante de ingresos para su sustento a pesar de haber estado casado legalmente casados por treinta y dos (32) años y quien dedicó su vida al hogar y a la administración de los negocios del demandado, sin contar el período de convivencia previo al matrimonio.

11. Para junio 2013 la demandante vivía con su hija, en una propiedad localizada en el Barrio Barrancas de Barranquitas, P.R., de 2,385.6138 metros cuadrados; perteneciente a las partes, pero dicho inmueble tenía vicios: el techo filtraba, varillas por fuera, la faltaba luz en un área de la casa por la que tenían que usar extensiones hacia las habitaciones, pintura, problemas de plomería"', entre otros, por lo que la condiciones en que ha estado viviendo no es apta para su salud. Previo al divorcio, y durante el matrimonio vivía en un inmueble que estaba en excelentes condiciones de 5 habitaciones, 3 baños, sala, comedor, cocina, antesala, balcón, ser hizo otra cocina, y tenía unos bajos.

12. Una vez la demandante decide separarse del demandado, éste continuó viviendo en la residencia

matrimonial hasta el presente. La cual los bajos durante el proceso los ha tenido alquilados a diferentes inquilinos. Dicha propiedad está localizada en el Barrio Cañabón (Barrancas) de Barranquitas, P.R. en un predio de 1,389.290 metros cuadrados.

13. Los ingresos durante el matrimonio eran los siguientes: (a) las rentas de diversas propiedades inmuebles, entre ellos, los bajos de la casa matrimonial ($250), una casa aledaña a la casa matrimonial ($300) que pagaba el papá de la demandante, otra casa al cruzar Bo. Barrancas, Barranquitas alquilada a Barbara Maisonet ($315); Awilda Hernández ($295), donde vive la hija ($260), casa en Parcelas Corozal se alquilaba en $340 arriba y $280 los bajos, la cual fue cerrada por el demandado una vez se instó la presente causa de acción; en Palo Blanco, Palmarito donde vive la madre del demandado donde éste le ha realizado mejoras; Naranjito - se alquiló a Hiram Caldero en $800 con opción a compra, y otro local a Francisco Fuentes Schwartz $560 (b) compra y venta de vehículos de motor;3 (c) vendía animales caballos, (d) vendió un pedazo de terreno; (e) prestamista, (f) trabaja en construcción; (g) siembra y vende sus siembras.

14. La demandante tenía pleno conocimiento de los negocios del demandado debido a que ella preparaba toda la documentación de todas las transacciones de negocio, preparaba los recibos, contabilizaba los dineros, los ponía en un sobre donde identificaba la cuantía habida en el sobre, y luego le era entregado al demandado. Los ingresos ascendían a más de seis mil dólares ($6,000) mensuales, más los beneficios del seguro social por incapacidad; dichos dineros eran guardados en una caja en la casa matrimonial y luego el demandado disponía de los mismos. Que al presente el demandado continúa recibiendo el seguro social, tiene propiedades alquiladas, siembra y vende sus cosechas, trabaja en la construcción, se dedica a la venta de vehículos de motor y es prestamista.

15. Desde el año 2014 fecha en que el demandado instó demanda de desahucio contra el padre de la demandante, a los fines de que esta no tuviera dichos dineros como ingresos, y hasta el presente la demandante no ha tenido participación alguna por concepto de las rentas que producen las propiedades pertenecientes a la extinta sociedad legal de gananciales. Un mero computo matemático evidencia que la demandante solo recibió los $300 a la que alude la sentencia de divorcio solo varios meses, es decir, hasta mayo de 2014.

16. La demandante padece de hipotiroidismo, alta presión, insomnio, colesterol, mala circulación, migraña, depresión, problemas estomacales, problemas de la espalda, problemas en la visión.

17. Las necesidades de la demandante son las siguientes: comida, celular, arreglo personal, gasolina, medicamentos, agua, luz, buzón, mantenimiento vehículo, ropa y zapatos, espejuelos, vivienda adecuada, comida fuera del hogar, efectos personales como desodorante, talco, entre otros; mantenimiento del patio donde reside, pago de un préstamo; tarjeta crédito de Sam's Club. Los

gastos de la demandante son considerados ordinarios y no constituyen gastos fuera de lo común como adujo el demandado en su contestación a la demanda.

18. Este tribunal toma conocimiento judicial que las partes instaron una causa de acción contra los Sres. Francisca Rivera, hermana del demandado, y su cónyuge Cristóbal Caldero con respecto a dos (2) propiedades que constaban a nombre de éstos últimos, en donde se resolvió que los dueños registrales eran testaferros, y que los dueños de ambos inmuebles son la aquí demandante y el demandado.

19. Al momento de la demandante abandonar el hogar conyugal allá para el abril de 2012 dejó en la misma todas las libretas de recibos, contratos, certificado de nacimiento, recibos de los muebles del hogar a nombre de ésta, los títulos y/o escrituras, ropa y zapatos, e incluso la suma aproximada de $150 a $180 mil dólares que tenían bajo llave en una caja fuerte en la residencia matrimonial.

20. Los dineros depositados en las cuentas bancarias que constaban a nombre del demandado provenían de los ingresos que generaba el demandado no sólo de su trabajo, sino de los cánones de arrendamiento de las propiedades arrendadas. Se hace constar que dichas cuentas bancarias fueron abiertas durante la vigencia del vínculo matrimonial por lo que los dineros allí depositados y retirados pertenecen a la ahora comunidad de bienes habida entre las partes, por lo que el 50% de los mismos le pertenece a la demandante.

21. La demandante conoce a Carlos Berrios (interventor) hace 41 años aproximadamente, ya que es hermano del demandado. Que Carlos ha residido en la ciudad de Nueva York toda su vida y estuvo casado con Mayra Alvarado. Cuando el interventor otorgó Poder82 allá para el año 1998 estaba legalmente casado, pero el poder dice que es "soltero". La prueba documental evidencia que dicho poder nunca se utilizó durante la vigencia del matrimonio.

22. El funcionario de la Cooperativa de Ahorro y Crédito de Barranquitas, Gerente de la oficina central declaró sobre el contenido de los documentos estipulados por las partes, respecto a tres (3) cuentas bancarias a nombre del demandado, la cual evidenció que el demandado sustrajo la suma de $134,101,72. Dicha prueba demostró que el demandado retiró sobre $100,000.00 gananciales el mismo día en que fue emplazado en la presente causa de acción, y luego retiró otras sumas de dinero según consta de la prueba estipulada.

23. Quedó demostrado que el demandado desde que se mudó a Puerto Rico allá en el año 1996 y a pesar de estar declarado incapacitado por la Administración del Seguro Social éste siempre ha trabajado dedicándose a lo siguiente: la compra y venta de vehículos de motor; alquiler de propiedades; prestamista, el cual quedó evidenciado con un pagaré, entre otros.

24. El testimonio del Sr. Francisco Fuentes Schwartz confirmó que las partes le arrendaron una parte de una estructura donde opera su negocio. Una parte era

arrendada por éste por la suma de $450.00, y luego fue aumentado por la suma de $560.68. La otra parte de la estructura le fue arrendada a Hiram Caldero por la suma de $800.00.

25. Luego de que las partes se separaran, la hija de las partes, Janine Berrios Pujols comenzó a realizar las labores y/o tareas que realizaba la demandante con respecto a los negocios del demandado, a petición de éste. La prueba documental y testifical creída por este tribunal demostró que efectivamente el demandado continuaba trabajando en sus negocios: de alquiler de propiedades inmuebles, venta de vehículos de motor, trabajaba en construcción, prestamista luego de que las partes se separaron, vendía animales al igual que siembras. Hizo constar que desde que tiene "uso de razón" todas las propiedades inmuebles pertenecen a sus padres, Nilsa y Jesús, y su padre siempre ha trabajado.

26. La señora Janine Berrios Pujols dejó hacerle los recibos y otra documentación a su padre debido allá para junio del 2013 cuando se dio cuenta de "cosas incorrectas e injustas" por parte de su padre, por lo que comenzó a sacarle foto a los recibos.

27. Surge de los autos, que no fue hasta el 11 de enero de 2018 que este tribunal impuso la suma de $400.00 por concepto de pensión alimentaria provisional, y a pesar de que el Tribunal de Apelaciones confirmó dicha resolución y orden allá para el mes de septiembre de 2018, el demandado se negó a pagar la suma impuesta por concepto de pensión alimentaria provisional, a tal punto que se acumuló una deuda de seis (6) mil dólares aproximadamente, por lo que este tribunal tuvo que citar el asunto para una vista de desacato.

28. El mismo día de la vista de desacato con respecto al impago de la pensión alimentaria provisional, el demandado radicó una petición ante el Tribunal de Quiebras donde incluyó la deuda alimentaria, y a su vez trajo consigo la suma de $3,000.00 para abonar a la deuda los cuales fueron consignados, hasta tanto y en cuanto se resolvería el asunto ante el Tribunal de Quiebras. Acreditado dicho dinero el demandado quedó adeudando a la demandante $3,000.00.

29. La única propiedad de la extinta comunidad de bienes que utiliza la parte demandante es la que en un momento dado le había sido alquilada a la hija procreada por las partes. Las demás propiedades están bajo el control absoluto de la parte demandada.

30. El demandado presentó como testigo al Sr. Hiram David Caldero Rivera, quien es comerciante hace 14 años en la industria de celulares y reparación de celulares ubicado en Naranjito. Admitió que originalmente el contrato con opción a compra del edificio donde ubica su negocio, el cual pertenece a las partes era por la suma de $280,000.00, y, $800.00 mensuales por concepto de alquiler, por una vigencia de 5 años. Que suscribió otro contrato de compraventa del inmueble allá para agosto de 2018 por la suma de $150mil.

31. No nos merece credibilidad el testimonio del Sr. Hiram Caldero a los efectos de que por razón de la remodelación de su negocio81, éste comenzó a pagar la suma de $400.00 por concepto de canon de arrendamiento, en lugar de los $800.00 que decía el contrato, y que luego del paso de huracán María allá para el año 2012 dejó de pagar el canon de arrendamiento. La prueba documental y testifical creída por este tribunal demostró la existencia de recibos de pago por la suma de $800.00 e incluso el propio demandado admitió que toda persona quien no le pagara la renta procedía a instarle una demanda de desahucio. No habiendo el demandado presentado demanda de desahucio en contra del Sr. Caldero, es necesario concluir que éste ha estado pagando y continúa pagando el canon de arrendamiento.

32. Tampoco nos merece credibilidad lo declarado por el Sr. Hiram Caldero a los efectos de que "no le pedía" recibo de pago al demandado por concepto del canon de arrendamiento pagado, ya que la prueba demostró la existencia de los recibos de pago. Por un lado si asumiéramos como cierto la aseveración hecha por dicho testigo a los efectos de que en un momento dado sólo pagaba la suma de $400.00 por el acuerdo que sostuvo con el demandado, la realidad es que se le hubiera expedido un recibo por dicha cantidad y no por la suma de $800.00; además nos resulta irrisorio que un comerciante no pida recibo de pago por el pago del canon de arrendamiento para así eventualmente tenerlo como evidencia para las planillas de contribuciones sobre ingresos de su negocio que en su día tiene la obligación de rendir. El testimonio del Sr. Caldero nos resulta uno "self serving" con el único propósito de beneficiar al demandado, y así no se consideren las rentas como ingresos o por el contrario, que dichas rentas no sean parte de los haberes de la extinta sociedad legal de gananciales habida entre las partes de la presente causa de acción.

33. El testimonio vertido por el interventor Carlos Berríos Rivera confirmó lo declarado por la demandante a los efectos de que para el año 1979 el demandado lo mandó a buscar para que se fuera a residir con éstos en los Estados Unidos y que para dicha fecha éste laboraba como empleado del demandado en la jardinería e incluso tenía conocimiento de que el demandante y la demandada cogían todos los beneficios gubernamentales en Estados Unidos, y que éstos se mudaron definitivamente a Puerto Rico para el año 1996. También, admitió que el demandado se enfermó en algún momento en los años 80 por asma crónica donde fue declarado incapacitado y a pesar de ello, el demandado continuó y continúa trabajando.

34. No nos merece credibilidad lo declarado por el interventor, Carlos Berrios Rivera con respecto a varios asuntos: (a) que es dueño de tres (3) propiedades: dos (2) en Barranquitas y otra en Naranjito; y fueron pagadas con dinero que produce en su negocio de la jardinería; (b) al ser confrontado con el Exhibit 25(g) estipulado con respeto al inmueble ubicado en Barranquitas adujo que adquirió la misma allá para el año 1987 y que mando ampliar y/o realizarle mejoras por lo que enviaba dinero a su hermano de nombre Enrique para que realizase las obras, y que las

demás propiedades habida en dicho solar también las mandó a construir.

35. Nos hiere la retina e incluso nuestros oídos lo declarado por el interventor al declarar que el inmueble ubicado en Cedro Abajo de Naranjito le pertenece a éste y al demandado, ya que surge de la prueba estipulada que el inmueble consta a nombre del demandado, quien compareció como soltero a pesar de para la fecha de adquisición estaba legalmente casado allá para el mes de enero de 1991, y conforme la prueba admitida surge que para el año 1991 éste no había otorgado la escritura de poder. Por otra parte, tampoco merece credibilidad de que éste haya pagado la suma total del precio de compraventa con respecto a dicho inmueble, ya que éste no presentó un ápice de prueba para demostrar que efectivamente le envió la suma de dinero, y que efectivamente era para que el demandado procediera adquirir dicho inmueble a nombre de ambos.

36. Se concluye que ese bien inmueble, localizado en el Barrio Cedro Abajo de Naranjito, P.R., y, que estaba alquilado al Sr. Hiram Caldero y al Sr. Francisco Rivera, fue adquirido con dinero producto de la Sociedad Legal de Gananciales y por lo tanto pertenece en partes iguales a la demandante y al co-demandado, Jesús Berrios Ortiz.

37. El interventor ni el demandado suministraron evidencia documental de naturaleza alguna, con respecto al alegado pago de renta por la suma de $200.00 del inmueble que constituyó la residencia matrimonial de la demandante y el demandado. Incluso el demandado al desglosar sus gastos no hizo mención que pagaba canon de arrendamiento alguno. Por lo que es necesario colegir que las partes durante la vigencia del vínculo matrimonial, ni luego del divorcio le han pagado canon de arrendamiento alguno al interventor. Por otro lado el interventor admitió que nunca ha residido en dicho inmueble, entiéndase, la que fuera la residencia matrimonial de las partes, e incluso, admitió que los servicios de agua y luz no constan a su nombre.

38. El interventor adujo que tiene cuentas bancarias en Puerto Rico: una en la Cooperativa La Sagrada Familia ubicada en Corozal a nombre de éste, y otra en la Cooperativa de Ahorro y Crédito de Barranquitas (Credicentro) a nombre del demandado ya que le tenía confianza. El testimonio de dicho testigo no sólo es mendaz sino, también, contradictorio. Con respecto a los dineros retirados de la cuenta en la Cooperativa de Barranquitas adujo que eran sus ahorros, y que él mismo viajó a Puerto Rico y sacó $100,000.00[97] allá para el año 2012[98] y luego adujo que le pidió al hermano que sacara dicho dinero. Tampoco nos merece credibilidad dicho testimonio, la prueba documental admitida por estipulación demostró que la única cuenta que poseía éste era la de la Cooperativa La Sagrada Familia en donde aparecía la demandante, no así el demandado. Nos preguntamos, si fuera cierta que éste le tenía tanta confianza a su hermano (demandado) porque razón la cuenta de la Cooperativa La Sagrada Familia no aparecía a nombre de éste y del demandado.

Por otra parte, los tribunales no debemos creer declaraciones que nadie más creería, debido a que los

dineros depositados en Credicentro fueron retirados el mismo día en que el demandado fue emplazado con respecto a la presente causa de acción. Hemos de preguntarnos, ¿a qué hora el interventor, se enteró del diligenciamiento del emplazamiento, que le dio tiempo dejar su negocio, sacar pasaje y llegar a Puerto Rico, dirigirse hacia Barranquitas, antes de que cerraran la Cooperativa, para acompañar al demandado a sacar los dineros? ¿si el dinero efectivamente era del interventor debido a que eran sus ahorros según éste declarara, porque éste no presentó copia del cheque que pudieron haberlo solicitado en la cooperativa para evidenciar que el mismo se hizo para beneficio del interventor?

39. En adición, en ocasión del contrainterrogatorio, el interventor admitió que nunca produjo copia del cheque de los $120 mil que se le solicitó en ocasión de la toma de deposición allá para marzo de 2014, como tampoco produjo las planillas de contribuciones sobre ingresos de los años 2013-2014, ni la evidencia de donde provenía la suma de $100mil, que tampoco rendía planillas en Puerto Rico de los alegados ingresos por concepto de rentas, ni los estados financieros, ni los estados de la cuenta bancaria de donde provenía dichos dineros; nunca ha pagado el CRIM de las propiedades alquiladas que aduce que le pertenece; no paga patente municipal ni al Municipio de Barranquitas ni Corozal ni Naranjito por el negocio de alquiler; como tampoco rinde al Departamento de Hacienda los alegados ingresos de las rentas, e incluso admitió que tampoco reportó los alegado dineros recibidos como ingresos en sus planillas en los Estados Unidos.

40. La realidad fáctica conforme surge de la prueba estipulada y admitida en evidencia es que el interventor nunca ha figurado en ningún contrato de arrendamiento con respecto al inmueble de Naranjito, ni aparece en la escritura, e incluso, ni recogía dinero por concepto de rentas, ni firmaba contratos de naturaleza alguna, ni instaba causa de acción de desahucio con respecto a ningún inmueble, e incluso expresó que desconocía cuanto se ha "recolectado" en rentas. A pesar de que éste negara que el modo operandi de su hermano (demandado) era poner propiedades a nombre de sus hermanos, y luego admitió dicho hecho.

41. No nos merece credibilidad lo declarado por el demandado Jesús Berríos Ortiz a los efectos de que no sabe leer ni escribir, que no trabaja y que sus únicos ingresos son de la Administración del Seguro Social. La prueba creída por este tribunal ha demostrado todo lo contrario, éste no solo recibe los beneficios del seguro social, sino que desde que le aprobaron dichos beneficios del seguro social allá para la década de los 80 éste siempre ha trabajado conforme surge no sólo de la prueba testifical de la demandante, la hija de éste, e incluso hasta el interventor quien es su hermano admitió que siempre ha trabajado.

42. A pesar de que el demandado negó que trabajara, al ser confrontado admitió que recibía dinero por concepto de rentas105, que prestaba dinero por lo que funge como prestamista, que vende vehículos de motor106, trabajaba en la construcción varios días a la semana, ha vendido animales, entre otros. Además, admitió que la

demandante y más adelante su hija Janine preparaban los contratos, recibos de pago e incluso recolectaban algunas rentas.

43. Con respeto a sus gastos, el demandado expresó que son los siguientes: $15.00 agua, luz -lo que llegue, compra (alimentos) paga $100.00 adicional a lo que le dan. Tiene los beneficios de Medicare, parte A y B, e incluso le incluyen un dinero para una comprita. No hizo alusión de que le pagaba renta de naturaleza alguna, ni presentó documento alguno para evidenciar que le paga la suma de $200.00 al interventor, como tampoco el interventor presentó evidencia a esos efectos. Es necesario colegir que éste nunca ha pagado renta.

44. El demandado admitió que el mismo día que fue emplazado en el caso de autos, entiéndase, el 15 de mayo de 2012 corrió hacia la Cooperativa y ese mismo día sacó la suma de $120 mil dólares.

45. A pesar de que el demandado niega haber puesto propiedades a nombre de otras personas, al ser confrontado con respecto a unos inmuebles ubicado en el término municipal de Corozal'10, admitió dicho hecho, pero adujo que "eso fue Nisa".

46. El demandado, además, admitió lo siguiente: (a) en la escritura del inmueble ubicado en Naranjito, se puso como soltero a pesar de estar legalmente casado con la demandante; (b) que su fenecido suegro pagaba bien, y a pesar de ello le radicó demanda de desahucio, a sabiendas que el canon de arrendamiento le correspondía a la demandante conforme la sentencia de divorcio, y le impusieron $300.00 por temeridad el cual al día de hoy no ha pagado, a sabiendas; (c) que toda persona que no le pagaba renta, le radicaba una causa de acción de desahucio por derecho propio; (d) que en Estados Unidos al igual que en Puerto Rico cogía todas las ayudas gubernamentales; (e) se quedó con todos los bienes muebles de la residencia conyugal y que fueron adquiridos durante la vigencia del vínculo matrimonial; (f) que durante la presente causa de acción ha vendido carros, entre ellos, un Suzuki; (g) no ayudaba económicamente a la demandante, (h) recibe rentas; (i) trabajó en la construcción de una piscina en Dorado desde 2012-2014, y al ser confrontado admitió que trabaja con el Sr. Ramón Rosado Ortiz como ayudante.

47. El demandado no controvirtió el testimonio de la demandante en cuanto a que el momento en que ésta abandonó el hogar conyugal allá para el año 2012, en la residencia conyugal había una caja con llave con la suma aproximada de $150 a $ 180 mil dólares, por lo que concluimos la existencia de dichos dineros, y son parte de los haberes que en su día deberá colacionarse al momento en que se liquide la extinta sociedad legal de gananciales.

48. Es evidente, que la demandante, luego de la separación y ruptura matrimonial con el demandado, Jesús Berríos Ortiz, quedó en una condición precaria económica.

Luego, conforme a las determinaciones de hechos antes expuestas y el derecho aplicable concluyó, en lo pertinente, lo siguiente:

> Un análisis de toda la prueba documental estipulada, así como la demás prueba admitida en evidencia en unión a la credibilidad de los testimonios vertidos, en la cual este tribunal tuvo extensa oportunidad de no sólo escuchar dichos testimonios, sino de evaluar su comportamiento o demeanor, apreciar sus gestos, titubeos, contradicciones y todo su comportamiento mientras declararon resolvemos que la demandante es acreedora de una pensión excónyuge, y que el demandante tiene capacidad económica para cubrir las necesidades de ésta. Nos merece entera credibilidad el testimonio de la demandante, así como de los testigos presentados por ésta, por el contrario, el testimonio del demandado y sus testigos no nos merecen credibilidad de clase alguna.
> [...]
>
> La demandante demostró mediante el quantum de prueba requerido que tiene la necesidad económica, debido a su divorcio, por su edad, que no tiene empleo, tiene condiciones de salud, y teniendo en cuenta la realidad económica del País, su grado de escolaridad es necesario colegir que su empleabilidad es remota, por lo que es acreedora de una pensión excónyuge, lo anterior no solamente es pertinente, sino suficiente para establecer que no cuenta con medios suficientes para vivir.
>
> Por otra parte, la prueba demostró que el demandado tiene capacidad económica para sufragar las necesidades económicas de la demandante, ya que recibe ingresos de la Administración del Seguro Social, así como de su trabajo por cuenta propia de todos los negocios que este opera, en la venta de vehículos de motor, venta de animales y siembra, como prestamista e incluso labora en el área de construcción.

En vista de lo antes expuesto, el TPI declaró Ha Lugar la solicitud de pensión excónyuge que presentó la señora Pujols. En consecuencia, le impuso al señor Berrios una pensión excónyuge de quinientos cincuenta ($550.00) dólares mensuales retroactivo a la fecha de radicación de la referida solicitud a saber, el 22 de julio de 2013. En vista de ello, puntualizó que el apelante adeudaba un retroactivo de ciento veintidós (122) meses para un total de $67,100.00. Aclaró que, de la suma antes expuesta, la apelada tenía un crédito en el caso de División de Bienes Gananciales. Por último, le ordenó al señor Berrios a pagar cinco mil ($5,000.00) dólares por concepto de honorarios de abogado.

En desacuerdo con esta determinación, el 5 de octubre de 2023, el apelante presentó una solicitud de reconsideración.[6] El 3 de enero de 2024, el TPI dictó una *Resolución* que se notificó el 4 de enero de 2024 declarando No Ha Lugar la referida solicitud.[7] Aún inconforme, el 5 de febrero de 2024, el apelante presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

**Erró el Tribunal de Primera Instancia al establecer una deuda por $67,100 sin tomar en consideración de que el demandado ha realizado diversos pagos directos por concepto de pensión alimentaria desde que se radicó el pleito.**

**Erró el Honorable Tribunal de Primera Instancia al determinar una pensión alimentaria de $550 mensuales cuando no se estableció específicamente cuanto le corresponde a la demandante, si algo por concepto de coadministradora de los bienes de la extinta sociedad legal de gananciales.**

**Erró el Honorable Tribunal de Primera Instancia, en determinar los otros ingresos del demandado, cuando ninguno de los anejos admitidos en el expediente judicial sustenta la cantidad $6- $7 mil dólares mensuales, siendo esa cantidad una completamente arbitraria.**

**Erró el Honorable Tribunal de Primera Instancia al determinar en la determinación de hechos #6 cuando se indica que la titularidad de las fincas 8875 y 4354, ambas de Barranquitas, le pertenecen a la extinta Sociedad de Gananciales compuesta por las partes, cuando la prueba documental admitida en evidencia, surge que el dueño registral de dichas fincas lo es el Sr. Carlos Berrios Rivera.**

**Erró el Honorable Tribunal de Primera Instancia al no determinar como hecho que la Sra. Pujols está coadministrando la comunidad de bienes ya que ella vive en uno de los inmuebles que le pertenece a la extinta Sociedad Legal de Gananciales, sin asignarle valor.**
**Erró el Honorable Tribunal de Primera Instancia al determinar una partida de honorarios de abogado por $5,000.00 ya que de la Sentencia del presente caso nada dispuso sobre temeridad o frivolidad, elementos necesarios para la imposición de honorarios de abogado.**

Atendido el recurso, el 7 de febrero de 2024, emitimos una *Resolución* concediéndole a la parte apelada hasta el 5 de marzo de 2024 para presentar su alegato en oposición. Sin embargo, el 8 de

---

[6] Íd., págs.31-34.
[7] Íd., pág.36.

febrero de 2024, la apelada presentó una *Moción Informativa y Solicitud de Prórroga* mediante la cual, en primer lugar, informó que teniendo en cuenta que la parte apelante estaba impugnando la apreciación de la prueba vertida ante el TPI, era indispensable que presentara una transcripción de la prueba oral. Así pues, indicó que según la Regla 22 de nuestro reglamento, una vez la parte apelante presentara la transcripción de la prueba oral y esta fuese estipulada por las partes, comenzaba a transcurrir el término que dispone nuestro reglamento para que la parte apelada presentara su alegato en oposición. Tomando en consideración la referida moción, el 15 de febrero de 2024, emitimos una *Resolución* concediéndole veinte (20) días a las partes para presentar una transcripción de la prueba oral estipulada. Además, establecimos que una vez se presentara lo antes indicado, la parte apelada tendría un término de veinte (20) días para presentar su alegato en oposición.

Posteriormente, el señor Berrios compareció ante nos mediante una *Moción en Cumplimiento de Orden* mediante la cual informó que presentaría la transcripción de la prueba oral. **No obstante, luego presentó otra moción informando que no utilizaría la transcripción de la prueba oral como parte de su apelación.** Así las cosas, le concedimos a la parte apelada hasta el 1 de abril de 2024 para presentar su alegato en oposición. Oportunamente, la señora Pujols presentó un *Alegato de la Parte Apelada* y negó que el TPI cometiera los errores que el señor Berrios le imputó. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver el asunto ante nos. *Veamos.*

II.

**-A-**

Según el Art. 109 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 385,[8] el deber de alimentar que existe entre los cónyuges

---

[8] El Código Civil de 1930 fue derogado por la Ley 55-2020, conocida como el Código Civil de Puerto Rico de 2020. Sin embargo, para propósitos de la adjudicación de este caso estaremos citando el Código Civil derogado, el cual

continúa aún después de decretado el divorcio. Lo anterior, debido a que, "disuelto el matrimonio y, en consecuencia, haber desaparecido el deber de socorro mutuo entre los cónyuges como efecto personal del matrimonio, uno de ellos puede caer en una situación de indigencia y necesidad tal que le impida hacer frente a las exigencias vitales". R. E. Ortega-Vélez, *Compendio de derecho de familia*, Publicaciones JTS, 2000, pág. 587. El derecho a solicitar alimentos excónyuge surge del derecho fundamental de todo ser humano a existir y desarrollar plenamente su personalidad. *Correa Márquez v. Juliá Rodríguez*, 198 DPR 315, 326 (2017). En ese contexto, "las pensiones alimentarias excónyuge están revestidas del más alto interés público". Íd. Conforme a esos principios, el Art. 109 del Código Civil de 1930, *supra*, establece lo siguiente:

> [s]i decretado el divorcio por cualesquiera de las causales que establece el Artículo 96 de este Código, cualesquiera de los excónyuges no cuentan con suficientes medios para vivir, el Tribunal de Primera Instancia podrá asignarle alimentos discrecionales de los ingresos, rentas, sueldos o bienes que sean de la propiedad del otro cónyuge.
>
> El tribunal concederá los alimentos a que se refiere el párrafo anterior, teniendo en cuenta, entre otras, las siguientes circunstancias:
>
> > (a) Los acuerdos a que hubiesen llegado los excónyuges.
> >
> > (b) La edad y el estado de salud.
> > (c) La cualificación profesional y las probabilidades de acceso a un empleo.
> >
> > (d) La dedicación pasada y futura a la familia.
> >
> > (e) La colaboración con su trabajo en las actividades mercantiles, industriales o profesionales del otro cónyuge.
> >
> > (f) La duración del matrimonio y de la convivencia conyugal.
> >
> > (g) El caudal y medios económicos y las necesidades de uno y otro cónyuge.
> >
> > (h) Cualquier otro factor que considere apropiado dentro de las circunstancias del caso.
>
> Fijada la pensión alimenticia, el juez podrá modificarla por alteraciones sustanciales en la situación, los ingresos y la

estaba vigente al momento en que surgieron los hechos que dieron lugar a la presente controversia.

fortuna de uno u otro excónyuge. La pensión será revocada mediante resolución judicial si llegase a hacerse innecesaria, o por contraer el cónyuge divorciado acreedor a la pensión nuevo matrimonio o viviese en público concubinato.

Al interpretar el referido Artículo, en *Morales v. Jaime*, 166 DPR 282, 306 (2008) el Tribunal Supremo explicó que, al considerar otorgar la pensión excónyuge, los criterios enumerados en el Art. 109 del Código Civil de Puerto Rico de 1930, *supra*, se toman en consideración sólo para "fijar el monto de la obligación y no como una carga probatoria adicional que deba suplir el reclamante". (Énfasis nuestro). *Correa Márquez v. Juliá Rodríguez, supra,* pág. 326. Estos criterios fueron elaborados para guiar la discreción del juzgador respecto a la solicitud del excónyuge reclamante y, una vez determinada la necesidad por cualquier medio, estos factores no pueden utilizarse para descartar la pensión. *Morales v. Jaime, supra,* pág. 308 y 310.

Sobre la cualificación profesional y las probabilidades de empleo, este criterio no impone al excónyuge reclamante la obligación específica de demostrar que no es joven, que no está en buen estado de salud y que no tiene capacidad para trabajar. Íd. En cuanto a la colaboración del excónyuge reclamante en las actividades mercantiles, industriales o profesionales del otro cónyuge, este indica que la colaboración plena en las actividades del excónyuge reclamado debe suponer un incremento en la pensión concedida. Íd., pág. 309. De igual forma, la duración del matrimonio y la convivencia conyugal se considera para determinar la cuantía de la pensión. Íd.

De otra parte, al interpretar las disposiciones del Art. 109 del Código Civil de Puerto Rico de 1930, *supra*, el Tribunal Supremo explicó que **"[e]l criterio principal al momento de conceder una pensión excónyuge es el binomio constituido entre la necesidad económica por parte del alimentista y la capacidad económica por parte del alimentante".** (Énfasis nuestro). *Correa Márquez v. Juliá Rodríguez, supra,* pág. 326. Sobre la necesidad económica, esta debe surgir como consecuencia del divorcio. Íd. Es decir, "cuando la necesidad del

reclamante esté vinculada al divorcio, o surja como consecuencia de este, deben reclamarse alimentos al excónyuge. Íd., pág. 302. La necesidad económica puede surgir por la terminación del deber de socorro entre los esposos o por falta del sustento cotidiano al que estaba acostumbrado el cónyuge reclamante. Íd., pág. 303. Según Ruth Ortega-Vélez, al otorgar una pensión, **los tribunales tienen amplia discreción para aplicar los criterios establecidos en la ley y si ejercen esa discreción con justicia y equidad, las sentencias sobre alimentos excónyuge, serán sostenidas por un tribunal de superior jerarquía.** (Énfasis suplido) Ortega-Vélez, *Compendio de derecho de familia, op. cit.,* pág. 588.

**-B-**

La Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2, establece que las determinaciones de hechos que toma el foro primario a base de testimonio oral "no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos". Asimismo, la Regla 110 de Evidencia, 32 LPRA Ap. VI, R.110, dispone que "será el juzgador de hechos quien deberá evaluar la prueba presentada con el propósito de determinar cuáles hechos fueron establecidos o demostrados". Por tal razón, es norma reiterada que cuando se le solicita a un foro apelativo que revise cuestiones de hechos, la apreciación de la prueba, en primera instancia, le corresponde al tribunal sentenciador, ya que estos tienen la oportunidad de observar y oír a los testigos, y por ello, están en mejor posición de evaluarla. *Pueblo v. Acevedo Estrada,* 150 DPR 84, 98-99 (2000). En ese sentido, la evaluación del foro sentenciador merece respeto y deferencia. *González Hernández v. González Hernández,* 181 DPR 746, 776 (2011).

Cónsono con ello, por lo general, "los tribunales apelativos no intervenimos ni alteramos innecesariamente las determinaciones de hechos que hayan formulado los tribunales de primera instancia luego

de admitir y aquilatar la prueba presentada durante el juicio." *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 65 (2009). No debemos descartar las determinaciones "tajantes y ponderadas del foro de instancia" y sustituirlas por nuestra propia apreciación a base de un examen del expediente del caso. Íd., págs. 65-66. Ahora bien, el respeto al arbitrio del juzgador de hechos "no es absoluto" pues "[u]na apreciación errónea de la prueba no tiene credenciales de inmunidad" frente a nuestra función revisora. *Ramos Acosta v. Caparra Dairy Inc.*, 113 DPR 357, 365 (1982). Los foros apelativos podremos intervenir con la apreciación de la prueba cuando exista error manifiesto, pasión, prejuicio, parcialidad o cuando un análisis integral, detallado y minucioso de la prueba así lo justifique. *Pueblo v. Casillas, Torres*, 190 DPR 398, 426 (2014); *González Hernández v. González Hernández*, *supra,* pág. 777. Por otro lado, al evaluar conclusiones de hecho a base de prueba pericial o documental, estamos en igual posición que el foro recurrido. Íd.

En cuanto al prejuicio, pasión o parcialidad, existen si el juzgador "actúa movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018). Por otro lado, se consideran erróneas las conclusiones del foro apelado, si de un análisis de la totalidad de la prueba, el foro apelativo entiende que esta se distancia de la realidad fáctica o es inherentemente imposible o increíble. *Pueblo v. Irizarry*, 156 DPR 780, 816 (2002).

**-C-**

La Regla 44.1(d) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1, establece que "[e]n caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al o a la responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal

conducta. [...]". Lo anterior quiere decir que, si el tribunal sentenciador determina la existencia de temeridad, la imposición de honorarios es imperativa. *Meléndez Vega v. El Vocero de PR,* 189 DPR 123, 211 (2013).

En términos generales, la temeridad es aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias. *Maderas Tratadas v. Sun Alliance et al.,* 185 DPR 880, 925 (2012). El propósito de la imposición de honorarios de abogado en casos de temeridad es penalizar a un litigante perdidoso que, por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito. *Andamios de P.R. v. Newport Bonding,* 179 DPR 503, 520 (2010). Además, la imposición de temeridad tiene el propósito de disuadir la litigación innecesaria y alentar las transacciones mediante la imposición de sanciones a la parte temeraria para compensar los perjuicios económicos y molestias sufridas por la otra parte. *Blás v. Hosp. Guadalupe,* 146 DPR 267, 335 (1998).

Según el Tribunal Supremo, existe temeridad en las siguientes instancias: 1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; 2) defenderse injustificadamente de la acción; 3) creer que la cantidad reclamada es exagerada y que sea esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; 4) arriesgarse a litigar un caso del que se desprendía prima facie su responsabilidad y 5) negar un hecho que le conste es cierto a quien hace la alegación. *C.O.P.R. v. S.P.U.,* 181 DPR 299, 342 (2011). La evaluación de si ha mediado o no temeridad recae sobre la sana discreción del tribunal sentenciador y sólo se intervendrá con ella en

casos en que dicho foro haya abusado de tal facultad. *PR Fast Ferries et al. v. AAPP*, 2023 TSPR 121, 213 DPR ___ (2023).

Por el contrario, la temeridad es improcedente en aquellos litigios que contienen controversias complejas y novedosas aun no resueltas en nuestra jurisdicción o cuando la parte concernida responde a lo que resulta ser una apreciación errónea del derecho. *Meléndez Vega v. El Vocero de PR*, supra, pág. 212.

III.

De entrada, cabe precisar que, las determinaciones de hechos basadas en la apreciación de la prueba oral y la credibilidad de los testigos que realicen los foros primarios merecen la mayor deferencia judicial, pues son estos los que tuvieron la oportunidad de evaluar el comportamiento de los testigos y sus reacciones durante la vista administrativa. Particularmente, el Tribunal Supremo estableció que este foro intermedio está impedido de intervenir con la apreciación de la prueba oral en ausencia de una transcripción o exposición narrativa de una prueba oral.[9] En el caso de marras, el apelante informó que no presentaría la transcripción de la prueba oral. Por lo tanto, estamos impedidos de evaluar en sus méritos cualquier señalamiento que impugne alguna determinación del foro primario que surja de su apreciación de la prueba oral.

Atenderemos los primeros tres señalamientos de error en conjunto, por estar estrechamente relacionados entre sí. En su primer señalamiento de error, el apelante indicó que el TPI erró al establecer una deuda de $67,000.00 sin tomar en consideración que este realizó diversos pagos directos por concepto de pensión alimentaria desde que se radicó el pleito. En su segundo señalamiento de error, sostuvo que el TPI erró al imponerle una pensión alimentaria de $550.00 mensuales sin determinar cuánto le corresponde, si algo, a la apelada como coadministradora de los bienes de la extinta sociedad legal de

---

[9] Véase, *Santiago Ortiz v. Real Legacy Assurance Company, Inc.*, 206 DPR 194, 219 (2021); *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 490 (2016); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013).

gananciales. Asimismo, en su tercer señalamiento de error, puntualizó que, el TPI erró al determinar sus otros ingresos ya que, según este, ninguno de los documentos admitidos en evidencia los sustenta.

En primer lugar, del desglose que realizó el TPI en el dictamen recurrido de la prueba documental estipulada por las partes y la admitida por estos, no surge que el apelante sometiera algún recibo de pago por concepto de pensión excónyuge. Además, el TPI realizó determinaciones de hechos basadas en la prueba oral, mediante las cuales indicó que el señor Berrios admitió que recibía los beneficios del Seguro Social por incapacidad, dinero por concepto de rentas, que era prestamista, vendía carros, y trabajaba en construcción, entre otros oficios. Asimismo, expresó los gastos personales admitidos por el apelante, así como los fondos que este aseveró que conservaba en sus cuentas bancarias. Por lo tanto, ante la deferencia que debemos concederles a las referidas determinaciones, es forzoso concluir el foro apelado no erró al determinar los ingresos del señor Berríos y consecuentemente estableció la cuantía de la deuda y la suma del pago de la pensión en controversia correctamente. Consecuentemente, no se cometieron estos errores.

Por otro lado, en su cuarto señalamiento de error, el señor Berrios expresó que el TPI erró al realizar la determinación de hechos núm. 6, mediante la cual indicó que la titularidad de las fincas 8875 y 4354, ambas ubicadas en el municipio de Barranquitas, le pertenecían a la extinta sociedad legal de gananciales cuando de la prueba documental admitida en evidencia surge que el dueño registral de las referidas fincas lo es el Sr. Carlos Berrios Rivera. Nótese que la controversia sobre la titularidad de las aludidas fincas se está dilucidando en el Caso Civil Núm. B3CI201300428, sobre liquidación de sociedad de bienes gananciales. Por lo tanto, concluimos que este error se cometió y el TPI se extralimitó al hacer una determinación que le compete al juzgador de los hechos del otro litigio.

En el quinto señalamiento de error, el apelante adujo que el TPI erró al no realizar una determinación de hecho indicando que la señora Pujols era coadministradora de la comunidad de bienes por vivir en uno de los inmuebles pertenecientes a la extinta sociedad de gananciales sin asignarle valor. Como mencionáramos, el TPI determinó la cuantía de la pensión alimentaria excónyuge tras el análisis de múltiples factores, entre ellos varias determinaciones de hechos sobre la situación económica del apelante. Como ya expresamos, esas determinaciones merecen nuestra total deferencia. Además, la escueta discusión de este señalamiento no nos permite determinar que el hecho de que la señora Pujols resida en un inmueble que pertenece a la comunidad de bienes amerite una reducción de la pensión impuesta. A tales efectos, este error tampoco se cometió.

Por último, el señor Berrios alegó que el TPI erró al imponerle cinco mil ($5,000.00) dólares en honorarios de abogado por temeridad a pesar de que nada se dispuso sobre temeridad o frivolidad. No le asiste la razón. Como es sabido, la temeridad es aquella conducta que promueve un pleito que de otra manera se pudo haber evitado; aquella conducta que prolonga un pleito innecesariamente; y, por último, aquella conducta que requiera que la otra parte realice gestiones innecesarias. Nuestro Tribunal Supremo ha resuelto que cuando un tribunal condena a la parte perdida de un pleito a pagar honorarios de abogado, esta imposición constituye una determinación implícita de temeridad.[10] Además, es harto sabido que la determinación de temeridad por parte del TPI es discrecional y merece nuestra deferencia a menos que se demuestre un abuso de tal discreción. Ante la imposición de honorarios de abogado contra el apelante por el foro apelado, estamos ante una determinación implícita de temeridad. El señor Berrios no demostró que este haya sido arbitrario o haya abusado de su facultad discrecional. Por lo tanto, este error no se cometió.

IV.

---

[10] *González Ramos v. Pacheco Romero,* 209 DPR 138, 148 (2022).

Por los fundamentos antes expuestos, *modificamos* el dictamen recurrido con el fin de eliminar la determinación del TPI sobre la titularidad de las fincas 8875 y 4354, la cual será adjudicada en el pleito relacionado a la liquidación de bienes gananciales antes mencionado. Así modificado *confirmamos*.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones